**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JASON R. BOHLANDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 08-cv-605-TLW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## ORDER AND OPINION

Plaintiff Jason R. Bohlander, pursuant to 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying plaintiff's application for supplemental security benefits ("SSI") under Title XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 9). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

### Plaintiff's Background

Plaintiff was born August 23, 1966 and was 41 years old at the time of the Administrative Law Judge's ("ALJ") final decision on April 8, 2008.[1] (R. 31, 93, 98). Plaintiff made conflicting statements regarding his educational background, at one point saying that he had completed the eighth grade (R. 32, 114) but at another point saying that he quit school in the

---

[1] Plaintiff's application for SSI was denied initially and upon reconsideration. (R. 59, 63-65, 62, 68-70). A hearing before ALJ Richard Kallsnick was held January 15, 2008, in Tulsa, Oklahoma. (R. 26-58). By decision dated April 8, 2008, the ALJ found that plaintiff was not disabled at any time through the date of the decision. (R. 9-19). On September 12, 2008, the Appeals Council denied review of the ALJ's findings. (R. 1-2, 425-26). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

fourth grade. (R. 216). Plaintiff was previously incarcerated (released in May, 2005) and stated that he attempted to test for his GED while in prison, but reportedly did not pass the necessary pretest. (R. 32-33, 216). Plaintiff was placed in a "work program" upon his release from prison to attempt to transition him into a work environment. (R. 33-34). Plaintiff's prior work consists of odd jobs and work at a few restaurants. (R. 114, 216). He explained at the hearing that one of his restaurant employers informed him that he would be "let go" due to "being too slow," so he quit instead and moved to Tulsa. (R. 34). Plaintiff also testified that he worked at a McDonald's restaurant in Tulsa but was not allowed "to be around food" because of his hepatitis C diagnosis. (R. 35). Plaintiff quit his job at McDonald's due to poor performance; he "was not quick enough." (R. 35). Plaintiff stated he had difficulties leaving his home when he was working (R. 36) and stated he was attending counseling sessions with a psychiatrist and a therapist for mental health therapy and medication management. (R. 37-38).

Plaintiff protectively filed an application for SSI on October 17, 2005, originally claiming a disability onset date of December 1, 1985. (R. 98, 109). Plaintiff's attorney informed the ALJ that plaintiff had previously received SSI benefits and was "applying to have his benefits reinstated," although in this case plaintiff filed a new application for SSI, not an application to reinstate his prior benefits or reopen his prior case. (R. 29, 93-96). Plaintiff amended his onset date to October 28, 2005 at the hearing. (R. 30). In his initial Disability Report-Adult (which is undated), plaintiff alleges "learning disab[ility], [T]ourette syndrome, hep[atitis] C/bipolar/back" as the conditions that limit his ability to work. (R. 109).

Plaintiff also testified at the hearing to several mental impairments that limit his ability to function normally, including side effects from medications. (R. 36-42). He claimed that these side effects make him very sleepy during the day and that he is only awake for approximately

five to seven hours each day. (R. 39-40). Plaintiff claimed that every other month he has episodes during which he secludes himself in his room for a week at a time. Plaintiff claimed that every week he has periods when he does not want to be around people and secludes himself in his room for shorter periods of time. (R. 41). Plaintiff's attorney stipulated at the hearing that plaintiff was "not alleging that he has any significant physical impairments that are limiting, [t]he bulk of his impairments are mental in nature." (R. 30-31).

The first medical records in plaintiff's file are from the Oklahoma Department of Corrections and consist of a "Discharge Health Summary Plan" and a single sheet "Progress Note." These records include a listing of current health problems, including "bipolar, last mental health appointment 9/6/05, seizure disorder, last chronic clinic 7/18/05, . . . hepatitis C, avoid Tylenol." (R. 158). On November 29, 2005, plaintiff was referred to Alan W. Sweet, Ph.D. for a psychological evaluation using the Wechsler Adult Intelligence Scale-Third Edition to assess his current level of functioning in connection with his application for benefits. (R. 160).[2] The only case history Dr. Sweet was given consisted of "two pages of a form 3368. No other history was supplied."[3] Id. Dr. Sweet gathered information from plaintiff, who claimed his basis for disability was "mentally, bipolar, [and] antisocial disorder." Id. Plaintiff reported suffering grand mal seizures for the past 15 years due to a brain injury in a motor vehicle accident. Plaintiff reported that he was in fifth grade when he was placed in Children's Medical Center in Tulsa. He reported being transferred to the Tulsa Boys Home, and then transferred to the Central Oklahoma Juvenile Facility in Shawnee until he turned eighteen. At the time, Plaintiff believed

---

[2] Dr. Sweet's report is dated December 8, 2009.
[3] A "form 3368" is a "Disability Report-Adult." The initial Form 3368 in plaintiff's record is eight (8) pages in length.

himself to be an institutionalized individual. Id. In Dr. Sweet's discussion, he noted plaintiff to be an individual with "long-standing adjustment difficulties since childhood . . . he went to Eastern State Hospital with regularity with a reported diagnosis of bipolar disorder." (R. 161). Without records to verify, Dr. Sweet could not say how accurate plaintiff's reported history was but indicated that certain of plaintiff's criminal conduct seemed "in large part a result of his bipolar illness." Id.

Dr. Sweet noted that plaintiff's overall intelligence level of 79 meant that plaintiff was functioning at "about the intersection of the low average intelligence range and the borderline range of intellectual functioning." Id. Dr. Sweet opined that plaintiff's ability to perform work-related mental activities appeared at least moderately impaired; his ability to interact socially appeared mildly to moderately impaired; and, his ability to adapt to a competitive work environment appeared to be moderately to severely impaired. In Dr. Sweet's opinion, plaintiff would not be able to manage in his own interests or any monetary benefit payments he might receive. Id.

On December 12, 2005, plaintiff was seen by Dr. Steven Y. M. Lee, M.D. for an agency physical examination. Plaintiff's chief complaints were depression, anti-social behavior, and a bad back. Dr. Lee examined plaintiff and performed several tests. Dr. Lee found that plaintiff was experiencing no pain and had full range of motion. (R. 164-170). In addition, Dr. Lee found that plaintiff's flexion, extension and lateral bending of the back were normal; however, Dr. Lee diagnosed plaintiff with "[d]epression, by history; [a]nti-social behavior, by history; [and] [l]ow back pain, by history." (R. 165).

Plaintiff is a self-admitted "cutter" (one who cuts themselves as a form of self-injury[4]) and claims to have been cutting himself since he was seventeen. (R. 190, 192). He was admitted to Columbia Wagoner Hospital from February 20, 2006 to February 27, 2006 on an emergency detention order from Creek County after calling a "hotline" and saying that he wanted to cut himself. (R. 190-213). Plaintiff also reported being hospitalized ten years earlier at Wagoner Community Hospital. (R. 192).

On September 29, 2006, plaintiff was treated and released at St. John Medical Center for a concussion and bruising after an alleged assault. (R. 271-273).

On November 20, 2006, plaintiff saw Dennis A. Rawlings, Ph.D. for another agency mental status exam. Plaintiff provided Dr. Rawlings a recent medical history, and Dr. Rawlings was able to review medical records provided by the Division of Disability Determinations, both of which Dr. Rawlings deemed reliable. (R. 215). Plaintiff presented with complaints of "mood swings, fatigue, concentration problems, learning problems, reading problems, memory problems, alcoholism, drug dependence, anger problems and occasional sleep problems." He denied chronic pain, but reported chronic bronchitis and hepatitis C. (R. 216). Plaintiff told Dr. Rawlings that he was raised by his natural mother "off and on" and that he was in foster care, a boys' home, Rader Center, and Children's Medical Center. Id. Plaintiff stated that he attended school through the fourth grade in learning disabled classes and then quit, because he could not do the work. Plaintiff reported that he began drinking at age sixteen and was drinking on a regular basis by age seventeen. Id. Plaintiff stated that he began abusing drugs at age twenty-one and was doing so on a regular basis by age twenty-two. Plaintiff stated that he participated

---

[4] Self-injury is an act of deliberately harming your own body (e.g., by cutting) and is not usually a suicide attempt. http://www.mayoclinic.com/health/self-injury/DS00775.

5

in Alcoholics Anonymous and had been to alcohol detox two or three times and to treatment twice but had never been to drug detox or treatment. Plaintiff informed Dr. Rawlings he had been jailed seven times for "possession, DUI, DWI, public intox[ication], and concealing stolen property." He had been in prison twice, serving "three and a half years" total. Plaintiff reported losing six (6) jobs due to his problems. Id.

Plaintiff described a family history of psychiatric hospitalizations, severe depression, mood swings, and suicide attempts (eight or nine times) for himself and his maternal cousins. Plaintiff reported severe anxiety. He reported a history of sexual abuse by a teenager in one foster home beginning when plaintiff was ten years old and lasting approximately a month. He also reported emotional, physical and mental abuse by foster families, and mental abuse from his natural mother. While in prison, plaintiff claimed to have witnessed "stabbings" and to have "heard a murder." (R. 217). Plaintiff reported adverse reactive feelings regarding these experiences. Id.

Dr. Rawlings noted most of plaintiff's treatment was provided by local emergency rooms and CREOKS (CREOKS is a non-profit behavioral health facility offering various programs ranging from psychiatric counseling and medication management to substance abuse counseling).[5] (R. 217). Plaintiff stated he can perform daily chores to keep a house clean and groom himself independently. He stated that he does not drive and does not like to shop when there are crowds. He reported leaving his home only three or four times in an average week. (R. 218).

Dr. Rawlings conducted routine tests and concluded that plaintiff's general fund of information was adequate, his attention span was intact, his working memory was intact to

---

[5] There are no records from CREOKS in plaintiff's Administrative Transcript. www.creoks.org.

unreliable, his concentration was intact, his calculations for simple problems was intact, his judgment, similarities, and proverbs were intact, and his abstraction skills were present. Dr. Rawlings estimated plaintiff's intelligence level to be at 75 to 80 and his word recognition ability to be at the second grade level, concluding that plaintiff appeared to be illiterate. (R. 219). Dr. Rawlings also found that plaintiff's insight into problems was intact, with the exception of denial of his alcoholism and drug addiction. Plaintiff's impulse control appeared intact, but was highly influenced by anxiety, and plaintiff's social functioning was limited by PTSD and social phobia with panic attacks. Dr. Rawlings noted plaintiff was not able to manage his own funds due to alcohol. (R. 221). He diagnosed plaintiff with an Axis GAF score of 60. (R. 222).

On March 10, 2007, after complaining of chest pain, plaintiff was admitted to St. John Medical Center for "inpatient stabilization, therapeutic milieu and 24 hour nursing availability" due to alcohol intoxication. (R. 274). Plaintiff was stabilized, received group and individual counseling, and was discharged March 12, 2007. Id.

On May 4, 2007, plaintiff called EMSA after cutting himself "deeper than usual" with a razor. He was admitted to St. John Medical Center for inpatient stabilization, therapeutic milieu and 24 hour nursing availability. (R. 304). Plaintiff was placed back on Prozac (anti-depressant, 20 mg) and discharged on May 7, 2007, with a referral to Family and Children's Services for follow up care. Id. Plaintiff denied any suicidal ideations. (R. 305).

Plaintiff was seen at Family and Children's Services from May 8, 2007 to July 23, 2007 for assistance with basic living arrangements, medication management, individual counseling, and group therapy. Plaintiff was seen by Tracy Loper, M.D. for medication management and Jennifer Price, B.S., B.A. for Case Management. Plaintiff attended group therapy, with some lapses in attendance, and he attended individual therapy sessions. (R. 250). Plaintiff had a

7

treatment plan in place, with expectation of completion in May, 2008. (R. 230-38). He was prescribed Prozac for depression, Geodon for mood stabilization, and Vistaril for anxiety.[6] (R. 246). According to the records of Family of Children's Services, plaintiff attempted suicide in June, 2007, was admitted to St. John's and then discharged on June 18, 2007. (R. 252). At some point, Plaintiff stopped taking the Prozac as he felt his "mood [was] good" with the Geodon alone. (R. 269).

During this time period, plaintiff was twice referred to Tulsa Center for Behavioral Health for inpatient mental health treatment (by Dr. Larson first and then again by Dr. Farmer of St. John Medical Center).[7] Plaintiff was discharged without medication and with concurrent referrals to Family and Children's Services, Twelve and Twelve, Inc., and Tulsa Center for Behavioral Health "co-occurring". (R. 433).

On October 21, 2007, plaintiff was admitted to Hillcrest Medical Center with the complaint of hemoptysis (coughing up blood) and was discharged October 25, 2007 with the diagnosis of bronchitis with hemoptysis; alcohol abuse; rule out hematemesis (vomiting blood) with negative EGD; and elevated liver function tests. (R. 281). Testing confirmed hepatitis C. (R. 357, 359). Plaintiff was seen at Hillcrest again on December 26, 2007, with complaints of

---

[6] The record indicates that at various times during the Summer of 2007, plaintiff was taking Prozac (antidepressant) and an unknown sleeping pill that was reportedly giving him nightmares. (R. 435). In July, there is a note he was taking Wellbutrin (an anti-depressant used to treat major depressive disorder), Zyprexa (antipsychotic), and Ativan (to treat anxiety disorders). (R. 432). All drug descriptions are from www.drugs.com.

[7] The Court notes these records indicate a referral from St. John Medical Center, and although the Administrative Transcript has been verified twice by the Office of Appellate Operations, the records from St. John's where plaintiff was referred to Tulsa Center for Behavioral Health were either never provided for inclusion in the record or never requested.

fever, chest pain, abdominal pain, headache, nausea and vomiting. (R. 371). He was stabilized with an IV, given medications and discharged home.[8] (R. 375-376).

In assessing plaintiff's qualifications for SSI, the ALJ determined at step one of the five step sequential process that plaintiff had not been engaged in substantial gainful activity since October 28, 2005, the date of the application. (R. 14). At step two, the ALJ found plaintiff to have the severe impairments of depressive disorder, NOS, post traumatic stress disorder (PTSD), social phobia with panic attacks, reading disorder, history of substance abuse, avoidant personality disorder, and borderline intellectual functioning. Id. At step three, the ALJ determined plaintiff's impairments did not meet the requirements of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). Particularly, the ALJ determined plaintiff's mental impairments did not satisfy the requirements of listings 12.04, 12.05, 12.06, 12.08 or 12.09, including the "paragraph B" criteria ("paragraph D" of listing 12.05). (R. 14-15). The ALJ elaborated, stating plaintiff had only moderate difficulties in social functioning and concentration, persistence or pace, moderate restriction of activities of daily living, and no episodes of decompensation. In order to meet the "paragraph B" criteria limitations, a claimant's mental impairments must cause a "marked"[9] degree of limitation on the level of functioning in at least two of the four areas of evaluation, activities of daily living, social functioning, concentration, persistence or pace, and episodes of

---

[8] Plaintiff submitted to the Appeals Council records from Hillcrest Medical Center evidencing treatment from May 7, 2008 through May 9, 2008, for suicidal ideations. The Appeals Council found the records would not have changed the ALJ's decision. (R. 425). In addition, the records are outside the adjudicated time period allotted for review of this case. See 20 C.F.R. § 404.970(b); O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994).

[9] "Marked" is used as a standard for measuring the degree of limitation, and means more than moderate but less than extreme. 20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(C), Mental Disorders.

decompensation. The ALJ explained that plaintiff did not satisfy the "paragraph B" criteria of listing 12.05 because he did not have a "valid verbal, performance, or full scale IQ of 59 or less" (R. 15), nor did plaintiff satisfy the "paragraph C" criteria of listing 12.05 because he does not have a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." Id.

Before moving to the fourth step, the ALJ found plaintiff had the residual functional capacity ("RFC") to perform a full range of medium work with nonexertional limitations as follows:

> claimant has the residual functional capacity to perform a full range of medium work but with the following nonexertional limitations. He is limited to carrying out simple instructions under routine supervision. He can relate incidentally to other workers for work-related purposes. He can adapt to a work setting but can have only minimal contact with the public. Although he is on medications, he is not precluded from remaining alert and performing job functions.

(R. 15).

At step four, the ALJ determined that plaintiff had no past relevant work, and transferability of job skills was therefore not an issue. See 20 C.F.R. § 416.968. At step five, the ALJ considered plaintiff's age, education, work experience, and RFC and found there are jobs that exist in significant numbers in the national economy that plaintiff could perform. See 20 C.F.R. §§ 416.960(c) and 416.966. (R. 18). The ALJ discussed the testimony given by the vocational expert that jobs existed in the national economy for an individual with the plaintiff's age, work experience, education, and RFC such as cleaner (DOT 381.687-018), described as medium, unskilled work; sorter (DOT 753.587-010), miscellaneous hand worker (DOT 761.687-010), laundry presser (no DOT number given), and hand packager (DOT 753.687-038), all

described as light, unskilled work; assembler (DOT 732.684-062) and miscellaneous laborer (DOT 715.687-086), both described as sedentary, unskilled work. (R. 19). The ALJ concluded that plaintiff was not disabled under the Act from October 28, 2005, through the date of the decision. (R. 19).

**Non-Compliance of Plaintiff's Brief**

Plaintiff's brief is not in compliance with the Scheduling Order entered in this case. (Dkt. # 8). The Scheduling Order limits plaintiff's brief to four sections, as follows:

> **Section I – Statement of Facts:** Plaintiff should concisely summarize the facts which demonstrate that the Commissioner erred in finding that the Plaintiff was not disabled. Plaintiff should include specific references to the record.
>
> **Section II – Errors on Appeal:** Plaintiff must list and number each specific error the Commissioner or ALJ made in concluding that Plaintiff was not disabled. This section should not contain a discussion of each error.
>
> **Section III – Discussion of Errors on Appeal:** Plaintiff's brief should contain a separate sub-section for each error listed in Section II of Plaintiff's brief. Plaintiff must discuss each error which Plaintiff listed in Section II in detail, and explain why the error requires a reversal or a remand of the Commissioner's decision. Plaintiff should provide specific references to the record for each error. Citations to cases, statutes, regulations (C.F.R.), and applicable Social Security Rulings (SSR) are appropriate. Particular emphasis should be placed on decisions from the United States Supreme Court and Court of Appeals for the Tenth Circuit. In addition, emphasis should be placed on recent cases of which the Court may not yet be aware, and on those cases which are directly or closely on point with respect to a specifically alleged error.
>
> **Section IV – Relief Sought:** In one sentence, Plaintiff should state the relief which Plaintiff requests.

Plaintiff's brief includes seven separate sections and omits Section II entirely. Section II is critical to this Court's analysis, since it clarifies the specific error or errors on which a plaintiff's appeal is based. In the future, if plaintiff's counsel files a brief that does not comply with the Court's Scheduling Order in all respects, the brief will be stricken.

### Issue Raised

Whether the ALJ's determination regarding plaintiff's residual functional capacity is supported by substantial evidence.[10]

### Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 404.1512(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

---

[10] Plaintiff initially contends that the ALJ "did not follow Tenth Circuit case law, and [his Decision] was not supported by substantial evidence." (Dkt. # 17 at 1). This statement is entirely unhelpful to the Court. Next, plaintiff asserts that "[t]here is evidence in the record showing that [plaintiff] does not have the ability to adapt to a competitive work environment. Is [plaintiff] able to perform significant gainful activity?" Later in his brief, plaintiff states that the ALJ "failed to consider all circumstances surrounding his case in determining if [plaintiff] could perform work at a competitive level." (Dkt. # 17 at 10). These vague statements are only slightly more helpful in that they at least imply that plaintiff believes the ALJ erred in his formulation of the RFC. Thus, the Court will consider this issue on plaintiff's appeal noting first that plaintiff has misstated the legal standard to be applied by this Court; that is, whether substantial evidence supports the ALJ's Decision. See infra at 11.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

**RFC Formulation**

Plaintiff argues that he does not have the mental or physical capacity to perform work on a full-time basis and, as a result, that the ALJ's RFC determination was flawed. (Dkt. # 17 at 10). As set forth above, the question for the Court is whether substantial evidence supports the ALJ's RFC determination. The Court answers this question in the affirmative.

Plaintiff's argument regarding his physical limitations has been waived. See Wall v. Astrue, 561 F.3d 1048, 1066 (10th Cir. 2009). Plaintiff's counsel informed the ALJ at the hearing that plaintiff was "not alleging he ha[d] any significant physical impairments that [were] limiting. The bulk of his impairments are. . . mental in nature." (R. 30-31). Thus, plaintiff

cannot raise this issue on appeal, and the ALJ did not need to include any physical limitations in the RFC.[11]  Id. at 1067.

Plaintiff argues that the ALJ "must provide a narrative discussion describing how the evidence supports his or her conclusion" and that the ALJ "must 'discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." (R. 11) (citing SSR 96-8p, 1996 WL 374184 at *7).  Notwithstanding plaintiff's argument, the ALJ did fulfill these obligations.  Specifically, the ALJ's narrative clearly shows that the ALJ applied the requisite factors of 20 C.F.R. § 416.945 and SSR 96-8p.  The ALJ made allowances for plaintiff's exertional and nonexertional limitations in his RFC assessment and linked them to work-related activity.  (R. 15).  The Decision cites Dennis A. Rawlings, Ph.D.'s November 20, 2006 mental status evaluation, where plaintiff showed intact judgment and insight into his problems with the exception of denial of his substance abuse problem; his impulse control was described as intact but "highly influenced by anxiety," all despite his impairments from symptoms of anxiety and PTSD, noted by the ALJ. Id.

As to plaintiff's mental limitations, the ALJ first identified plaintiff's severe impairments, at step two, and then the ALJ incorporated the impairments into his analysis, finding that plaintiff had "moderate restriction" in activities of daily living, social functioning, and concentration, persistence and pace.  In making these findings, the ALJ discussed plaintiff's

---

[11] Notwithstanding plaintiff's waiver, the ALJ considered plaintiff's physical impairment of hepatitis C and incorporated it into the RFC, stating, "[Plaintiff's] hepatitis C does prevent him from working in the food and food service industries."  (R. 18).

testimony regarding his diminished capacity to be around others, his fear of leaving his home, spending time in seclusion, and his relationship with his girlfriend. (R. 16). The ALJ also mentioned plaintiff's testimony regarding his current mental health therapy, and the ALJ discussed plaintiff's medications and their reported side effects. Id.

Plaintiff did not have a treating physician, so the ALJ carefully considered, and relied upon, the two consultative agency examinations performed on plaintiff, one by Allen Sweet, Ph.D., and another by Dr. Rawlings. 20 C.F.R. § 416.927(d). The ALJ relied on the following language from Dr. Sweet's November 29, 2005 exam:

> [plaintiff] appeared to be functioning at or near the borderline range of intellectual functioning. His concentration, capacities for remembering and sustained concentration and persistence seemed at least moderately impaired. His social interaction ability appeared to be mildly to moderately impaired. His adaptation capacity for a competitive work environment seemed to be moderately to severely impaired.

(R. 16). The ALJ also cited Dr. Sweet's conclusion that the combination of plaintiff's mental illness and reported antisocial personality disorder caused impaired judgment and impulsivity. (R. 17).

The ALJ summarized Dr. Rawlings' examination of plaintiff in detail, including plaintiff's complaints of abuse as a child and of having to witness violent incidents during his prison term. (R. 17). The ALJ then specifically discussed the results of Dr. Rawlings' mental status evaluation of plaintiff. Dr. Rawlings found that plaintiff responded appropriately to proverbs, that his general IQ was between 75 and 80, his word recognition was at the second grade level and that plaintiff was illiterate. Id. The ALJ noted plaintiff reported feelings of anxiety to Dr. Rawlings when around more than five people and that he was bothered by "intrusive recollections, flashbacks and other retrospective forms of trauma." Id. Despite these

impairments, Dr. Rawlings found that plaintiff showed intact judgment and insight, aside from his denial of alcoholism and drug addiction. Dr. Rawlings stated plaintiff's impulse control was intact but highly influenced by anxiety and that his activities of daily living were within normal limits; however, his social functioning was limited by PTSD and social phobia with panic attacks. Dr. Rawlings also found that plaintiff was not able to manage his own funds due to his problems with alcohol. Id.

Dr. Rawlings found plaintiff's recall memory to be "functionally intact for simple and complex sentences as well as simple and three step directions." (R. 220). He found plaintiff's mental control and attention span intact, and his general fund of information adequate. Id.

The ALJ also considered plaintiff's treatment records from Family and Children's Services (FCS)[12] for the time period from May through July of 2007 and plaintiff's discharge papers from Wagoner Community Hospital. (R. 17, 229-270). Plaintiff was referred to FCS by St. John Medical Center after plaintiff cut himself "deeper than usual and became worried so he called EMSA." (R. 304). At FCS, plaintiff was treated by Tracy Loper, M.D., and Jennifer Price, B.S., B.A. (R. 229-270). Dr. Loper noted that plaintiff attended group sessions and was alert and aware of his surroundings and was well groomed. (R. 269). Dr. Loper also noted that plaintiff's mood was euthymic (normal, non-depressed) and that his speech was clear and logical. Id. Dr. Loper noted no suicidal or homicidal ideations or any psychosis. Plaintiff's attention and concentration were listed as adequate, motor activity was within normal limits and judgment and insight were noted as fair. Id. The last "plan" note in these treatment records

---

[12] The ALJ noted that plaintiff was attending "weekly counseling," and the records from Family and Children's Services are the only consistent counseling records in the transcript. In addition, plaintiff testified that he attended counseling sessions at Family and Children's Services. (R. 18, 37-38).

states that plaintiff was to continue on his current medications and return to the clinic in two to three months, "sooner if symptoms recur/worsen." Id. These records are consistent with Dr. Rawlings' report. Moreover, the ALJ took plaintiff's counseling into consideration in his RFC assessment when he noted:

> Regarding the claimant's alleged emotional difficulties, he appears to have them under control through medications and his weekly counseling. He has problems being around people but this in itself is not work-prohibitive.

(R. 18).[13]

As to Wagoner Community Hospital, the ALJ specifically noted that on February 21, 2006 plaintiff was admitted and that, upon discharge, his mental status examination found his memory was intact, he displayed fair attention and concentration, he enunciated well and appropriately answered questions. (R. 17).

Thus, the ALJ's assessment of plaintiff's mental limitations is supported by substantial evidence in the record.

Next, the ALJ specifically incorporated plaintiff's mental limitations in the RFC assessment:

> . . . with the following nonexertional limitations. He is limited to carrying out simple instructions under routine supervision. He can relate incidentally to other workers for work-related purposes. He can adapt to a work setting but can have only minimal contact with the public. Although he is on medications, he is not precluded from remaining alert and performing job functions.

(R. 15).[14] The ALJ provided for plaintiff's mental limitations in his RFC assessment in the following ways: by requiring that plaintiff be limited to jobs where he relates only incidentally

---

[13] The ALJ also found no episodes of decompensation as defined by the regulations. Id. See 20 C.F.R. § 416.920(a)(3), 20 C.F.R. Pt. 404, Subpt. P, App. 1. A review of the record supports the ALJ's finding in this regard.

17

to other employees for work-related purposes; by limiting him to jobs where he can follow simple instructions; and by limiting him to jobs where he only has minimal contact with the general public.

Next, the ALJ presented the vocational expert with the following hypothetical:

> Forty-one year old male, eighth grade education, limited or less ability to read and write, use numbers. Physically he can perform a full range of medium, light and sedentary.
>
> . . .
>
> Has been diagnosed with affective disorder and mental retardation, anxiety related disorder, as well as personality disorder. In that regard there are certain limitations. This individual would be able to carry-out [sic] simple instructions with routine supervision. He would be able to relate incidentally with coworkers and supervisors for work related, work related [sic] purposes. He would be able to adapt to a work setting, he should have minimal or no contact with the general public. Probably minimal contact with the general public. He currently is taking some medications, they would not preclude him from remaining reasonably alert to perform required functions presented in a work setting.

(R. 51-52). This hypothetical tracks the RFC and, thus, is supported by substantial evidence.

**<u>Credibility</u>**

Nowhere does plaintiff assert that the ALJ erred when he found that plaintiff's statements regarding his symptoms were not entirely credible. In fact, plaintiff only mentions the issue of credibility once, stating the bare, and correct, legal proposition that "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Thus, any objection as to the ALJ's credibility findings has been waived.

---

[14] The record shows that plaintiff has a substance abuse problem. The ALJ weighed plaintiff's history of drug and alcohol abuse and under the provisions of Public Law 104-121, found his substance abuse was not material to his disability, and therefore proceeded with his discussion of plaintiff's RFC. (R. 16).

See Wall v. Astrue, 561 F.3d 1048, 1067 (10th Cir. 2009) (district court need not consider undeveloped arguments).

## **Conclusion**

The Court finds that the ALJ evaluated the record in accordance with the legal standards established by the Commissioner and the courts. The Court further finds that there is substantial evidence in the record to support the ALJ's decision. Accordingly, the decision of the Commissioner finding the plaintiff not disabled is hereby AFFIRMED.

SO ORDERED this 16th day of March, 2010.

_____
T. Lane Wilson
United States Magistrate Judge